IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUINCY M. NERI and RODNEY RIGSBY,

                              Plaintiffs,

     v.

MELINDA MONROE, STEVE LARSON,
ARCHITECTURAL BUILDING ARTS, INC.,
LESLIE SAGER, ERIC FERGUSON and
RURAL MUTUAL INSURANCE COMPANY,

                            Defendants.

OPINION and ORDER

11-cv-429-slc

---

      This action for copyright infringement is before the court for a second summary judgment proceeding after remand by the Court of Appeals for the Seventh Circuit. Initially, this court found that plaintiffs Quincy Neri and Rodney Rigsby's claims of copyright infringement based on their "Artwork of Q" submission could not proceed because they lacked a valid registration in the copyright, and that any claims based on a later registration titled "Processes of Mendota Reflection" could not proceed because plaintiffs had not mentioned it until after the summary judgment briefs had been filed. *See* Opinion and Order, Sept. 21, 2012, dkt. 152. In an opinion issued on August 12, 2013, the Seventh Circuit disagreed with this court's analysis of the validity of plaintiffs' "Artwork of Q" registration and remanded the case for reconsideration, suggesting that it might be more prudent on remand to consider defendants' asserted defenses to infringement instead of revisiting the registration question. *Neri v. Monroe, et al.,* 726 F.3d 989, 993 (7th Cir. 2013).

      Taking their cue, defendants have withdrawn their objections to the validity of both of plaintiffs' asserted copyrights and now ask this court to rule on the other grounds raised in their summary judgment submissions, including the defenses of fair use, consent from a joint author,

implied license and lack of damages.  Plaintiffs have agreed to proceed in this fashion. Accordingly, all of the summary judgment motions, dkts. 68, 75, 80, 85 and 88, are before the court.

Having reconsidered the parties' summary judgment submissions, I conclude once again that plaintiffs' action must be dismissed.  As set out in more detail below, I agree with defendants that taking and displaying pictures of Neri's sculpture was permissible under the fair use doctrine and that in any event, plaintiffs cannot recover either statutory or actual damages.  In light of these conclusions, I have not addressed the other defenses raised by defendants.

As a preliminary observation, I note that plaintiffs have riddled their submissions with proposed facts that the court cannot accept because they suffer from one or more of these shortcomings: they are immaterial; not supported by the evidence cited; speculative; improper legal conclusions; and contrary to Neri's earlier, sworn deposition testimony.  As a result although plaintiffs purport to "dispute" many of defendants' proposed findings of fact, many of these claimed disputes are not genuine.  I highlighted plaintiffs' most prominent factual gaffes in the recitation of the facts below; in those situations where I have not explained why I found as undisputed other facts that plaintiffs claim are disputed, it is for one or more of the reasons itemized above.  The bottom line is that, after the court has culled out plaintiffs' unfounded legal conclusions, rank speculation and unsupported assertions, the few material facts that remain fall far short of establishing their claim of copyright infringement.

2

For the purposes of deciding the instant motions, I find the following facts to be material and undisputed:

FACTS

## I.  The Parties

Plaintiff Quincy Neri is a glass blowing artist who has worked with another local artist, Fritz Schomburg.[1]  Plaintiff Rodney Rigsby is Neri's business consultant and co-owner of the two copyrights at issue in this suit.

Defendant Melinda Monroe is president and co-owner of defendant Architectural Building Arts (ABA), along with defendant Steven Larson.   ABA is a general contractor design/build firm focused on residential and commercial interior remodeling.  Defendant Leslie Sager is an interior designer who was employed by ABA during the condominium remodel that is at issue in this lawsuit; she now is an adjunct faculty member of the University of Wisconsin-Madison Design Studies program.  Defendant Eric Ferguson is a professional photographer in Madison, Wisconsin.

## II.  The Hughes Condo Remodel and Creation of "Mendota Reflection"

In April 2008, ABA was hired by Linda Hughes to remodel her condominium in Madison, Wisconsin.  As part of the renovation of the entire residence, Hughes wanted ABA to remove a large mural from the dome of the entryway into her condominium and replace it with more

---

[1]  Schomburg originally was named as a defendant in this case but has settled with plaintiffs.

modern artwork.  ABA agreed to remove the mural, which required disassembling the dome rebuilding the ceiling.[2]

Hughes hired an interior designer, Amy Radspinner, to assist with the remodeling and to handle decorating.  Radspinner contacted Neri, with whom she had worked in the past, and told her about the plans for the entryway.  Neri, in turn, contacted her friend, fellow glass-blower and artist Schomburg.  Neri and Schomburg worked together to create a composition comprised of about 60 individual blown glass pieces that eventually were installed onto the remodeled ceiling of the entryway.[3]  Although Neri calls this glass sculpture "Mendota Reflection," neither she nor Schomburg referred to it by this title to any of the defendants until June 2011.[4]

ABA hired a professional engineer to help design the ceiling.  As part of this process, ABA met on several occasions with Schomburg, accompanied at times by Neri, regarding the design

_____

[2]  As defendants point out, plaintiffs seem to be operating under the mistaken assumption that they are entitled to recover from ABA money that Hughes paid ABA to remodel her condominium. This is a copyright infringement action.  Neri had no contract with ABA–she has so conceded--and she does not claim that ABA owes her money for the work she actually performed.  The only recovery available to plaintiffs in this lawsuit are either statutory or actual damages resulting from the alleged infringing activities, all of which occurred after the remodeling project was complete.  Therefore, Neri's estimates of what Hughes paid ABA to rebuild the ceiling, along with her apparent belief that she is entitled to some sort of compensation for allegedly pointing out to Hughes the value of the Richard Haas Mural, are irrelevant.

[3]  Defendants dispute Neri's contention that it was she rather than Schomburg who was hired by Radspinner to design and install the glass sculpture for Hughes's entryway.  Although I agree with defendants that Neri's evidentiary citations do not support these assertions, *see* Defs.' Response to PPFOF, dkt. 105, nos. 12, 14, 15, precisely who was hired by whom to do what is not material to the court's findings that (1) defendants' activities are protected by the fair use doctrine and (2) in any case, plaintiffs cannot recover damages.  Accordingly, it is unnecessary to untangle this factual dispute.

[4]  In the initial summary judgment proceeding, defendants argued that Schomburg and not Neri was the "true" author entitled to copyright the sculpture.  Although this court found it unnecessary to address this question, the Court of Appeals rejected it as an alternative ground for summary judgment.  *Neri*, 726 F.3d at 992 ("To the extent that Schomburg added features in the course of blowing the glass, he has a separate claim of intellectual property in a derivative work, but this does not detract from Neri's rights.").

and construction of the ceiling.  The purpose of these meetings was to ensure that the new ceiling would support the weight of the glass pieces and would compliment the artwork aesthetically. ABA decided that the best option was to convert the dome ceiling to a half-barrel vault ceiling. Although Neri made suggestions about various materials that could be used to support the weight of the glass artwork, she did not create any schematics or mock-ups of the ceiling or otherwise "design," engineer or construct it.[5]  ABA's design team, which included defendant Sager, also worked with Schomburg to determine the best lighting to complement the artwork, ultimately deciding to install lighting into a custom-designed alcove running along both sides of the ceiling.

Once the entryway ceiling was rebuilt, Schomburg, with Neri's help, mounted their glass pieces to the ceiling.[6]  The pieces were mounted into the ceiling through holes and then secured by Schomburg to the back side of the ceiling structure.  The lighting was directed onto the various pieces, casting spiral shadows onto the ceiling and walls.  Both Neri and Schomburg consider the spiral shadows to be an integral feature of the artwork.  Neri testified that she could not reproduce the artwork without reproducing an exact copy of the ceiling.

---

[5]  Although Neri asserts repeatedly in her submissions that she "designed" the ceiling, I agree with defendants that the evidence she cites does not reasonably support this assertion.  *See* Defs.' Joint Response to Pltff's PPFOF, dkt. 123, no.7.  At her deposition, Neri testified that she and Schomburg "came up with the idea of what would be the best materials to hang the glass pieces from," and that she suggested steel, then fiberglass, then drywall.  Dep. of Quincy Neri, dkt. 65, at 170.  However, Neri was not sure whom she talked to from ABA or who ultimately decided what material to use; she did not create any architectural drawings, schematics, or mock-ups of the ceiling; she does not have a degree in structural engineering; and she had no contract to build the ceiling.  On the basis of this evidence, no reasonable jury could find that Neri played any role in the actual design or construction of the ceiling except to suggest a list of materials from which it could be constructed.

[6]  The parties dispute whether Neri was solely responsible for how the pieces were arranged in relation to the ceiling and each other, or whether the final composition was the result of an on-site collaborative process involving Neri, Schomburg, Radspinner, Hughes and possibly others, but this dispute is not material.

Consistent with industry practice, before beginning work at the condominium, Monroe obtained Hughes's permission to take "before," "during," and "after" photographs of the entire remodeling project to document ABA's work, to advertise ABA's services and to apply for industry awards on ABA's behalf.  ABA hired defendant Ferguson to take a series of photographs of the interior of Hughes's condominium, including the entryway, hallways, bedrooms, bathrooms, living room, kitchen, atrium and entertainment center areas, in order to depict ABA's work.  The photographs taken by Ferguson after construction was complete include two photographs of the entryway and ceiling, shown below:

 

## C.  The Photographs of the Sculpture

As is apparent, the two "after" photographs of the entryway include glass pieces mounted onto the new ceiling.  Neither photograph depicts all of the glass pieces, although some pieces appear in both.  Ferguson's goal in taking these photographs was to showcase the design work and changes that ABA implemented in the entryway.  In addition to the glass pieces and the barrel-vault ceiling to which they are mounted, the photographs also depict the hall, including a waterfall designed by ABA, the furniture, other art and decorative accessories.  Hughes was aware of Ferguson taking photographs of her condominium and did not object to him taking or using the photographs.

When photographing the condominium, Ferguson employed his skills as a professional photographer to showcase ABA's remodeling work in the most aesthetically pleasing manner. Ferguson made significant artistic choices for each photograph in terms of lighting, angles, lens choice and camera choice, among other subjective, artistic judgments.  ABA paid Ferguson $1,200 to photograph Hughes's condominium and to grant ABA "unlimited rights of usage" of these photographs.  Other than this grant of usage rights, Ferguson retains full copyright of all of the photographs he took of Hughes's condominium.

Ferguson has never used the two photographs of in which the entryway artwork can be seen in any sort of advertisement or promotion or on his own website, and he has not sold them. Other than defendant Sager, no person or entity has ever contacted Ferguson to inquire about the photographs he took at Hughes's residence or the glass pieces that appear incidentally in some of the photographs.  Apart from the $1,200 he was paid by ABA to take the photographs, Ferguson has made no money from any of the photographs.

7

In late 2009 and early 2010, defendant ABA posted some of these photographs, including the two photographs depicting the entryway, in a newsletter and on its website, www.designbuildmadison.com.  ABA also submitted the photographs as part of its application for "Contractor of the Year" awards sponsored by the National Association of the Remodeling Industry.  NARI gives these awards each year to NARI members who have demonstrated outstanding work through their remodeling projects.  "Contractor of the Year" awards are not art awards.

ABA received two NARI Contractor of the Year awards for its interior design and its construction work at the Hughes' condominium, including its reconstruction of the entryway's ceiling and its fireplace redesign. ABA received another local and a regional NARI award for its remodeling work in the condominium's bathroom.

ABA did not claim to have made or to own the glass pieces that appear in the photographs of the entryway, and it did not sell any of Ferguson's photographs containing images of the sculpture.  ABA is not in the business of selling artwork or photographs of artwork.  Indeed, ABA did not benefit financially in any way as a result of the partial images of the artwork that appeared in Ferguson's photographs.[7]

With Ferguson's permission, in December 2009 or January 2010 defendant Sager posted one of Ferguson's photographs of the entryway ceiling on her own website, along with two "before" pictures showing the dome that had been removed.  Sager inserted the following text to accompany the photo:

---

[7] Neri disputes this, but her dispute is based purely on her speculation.  She has presented no evidence–there *is* no evidence–of actual revenues, sales, commissions, license fees or other financial benefit derived by ABA or any other defendant as a result of the photographs.

A LITTLE BIT OF GLASS

A large dome with a painting of the four seasons of Wisconsin by Richard Hass [*sic*] did not appeal to the new residents of this condominium.  They were able to donate the painting and dome to the Madison Children's museum for a tax deduction.  With the help of Amy Radspinner, I converted the dome into a smaller barrel vault with an integrated cover to conceal the LED spot lights. Local Glass blower Fritz Schomburg, designed a series of large aquatic glass pieces to hang from the vault in keeping with the lake view.

Sager's purpose in posting the photograph was to show her contribution to the renovation at the Hughes homes, namely, her work on the barrel vault ceiling and the lighting.

In March 2010, during a field trip to the Hughes residence with students from a class she was teaching at the University of Wisconsin, Sager took this photograph of her students looking at the vault ceiling where the artwork was installed:



Sager's photograph captures only a portion of the 60 glass pieces.  Sager posted this photograph on the University of Wisconsin's Design Studies website for the purpose of showing students engaged in an enrichment experience and not for any specific reason related to the glass artwork.

**D.  Neri Discovers the Photographs and Registers a Copyright in the Sculpture**

On April 14, 2011, Neri visited ABA's website and saw the two entryway photographs taken by Ferguson that depict some of the art glass pieces mounted on the entryway ceiling of Hughes' condominium.  The next day, Neri discovered the photographs posted by Sager on her websites.  Before then, Neri had not attempted to copyright, market or create derivative works from the sculpture.  In fact, Neri did not even associate herself with the work publicly apart from putting some photographs of it in her portfolio book.  For example, Neri did not post any pictures of the sculpture on her personal website.  According to Neri, it was not until she discovered that the artwork had "won" NARI awards that she began to think of it as anything but "just another project."  Neri Dep., Apr. 19, 2012, dkt. 65, at 75:2-10.[8]

One reaction might have been for Neri to be pleased to have received free advertising of her artwork; to the contrary, Neri was most displeased as evidenced by her reaction: Neri promptly registered a copyright for a work she called "The Artwork of Q," a collection that purported to include, among other things, "Mendota Reflection."  (This copyright was assigned registration no. VAu 1-066-185.)  Neri then filed this *pro se* suit on June 15, 2011, alleging that the defendants had "copied" Mendota Reflection by taking pictures of it and displaying it on their websites without her permission.  Shortly thereafter, ABA and Sager removed the allegedly infringing photographs from their websites and ceased all use of it.

On or about February 14, 2012, plaintiff registered a copyright for a sculpture titled "Processes of Mendota Reflection."  (This copyright was assigned registration no. VAu 1-092-

_____

[8] Neri's insistence that the sculpture "won" an award for which she received no credit is one of her persistent themes in this lawsuit, but it lacks any evidentiary support.  As I previously found, NARI awards are not art awards.  NARI awarded ABA for its construction and design work on the condominium, not for the sculpture.

700.)  Submitted with this application are photographs purporting to be pictures of the installation of the sculpture in the condominium's entryway.

As noted previously, although defendants argued initially that the "Artwork of Q" was not a valid registration and that it was too late in this case for Neri to amend her complaint to assert a violation of her copyright in "The Processes of Mendota Reflection," they have now withdrawn those objections, they concede the validity of the copyrights and they ask this court to rule on the merits of their defenses.

OPINION

## I.  Fair Use

Acknowledging that certain forms of copying are necessary to creative or academic endeavors such as education, journalism, humor and criticism, courts long have recognized that certain forms of copying a copyrighted work are permissible.  To determine whether a particular form of copying is a fair use of the copyrighted work, courts consider a number of factors, four of which are codified in The Copyright Act of 1976, 17 U.S.C. § 107:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

11

> (4)  the effect of the use upon the potential market for
>       or value of the copyrighted work.

As is plain from the statutory language, and as the Supreme Court has recognized, whether a particular form of copying is a fair use is an open-ended and context-specific inquiry. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).  Ultimately, the test of fair use is "whether the copyright law's goal of promoting the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2nd Cir. 1998) (internal quotations and citations omitted).

Because fair use is affirmative defense to a claim of copyright infringement, it is defendants' burden to prove it. *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).  I address each of the four statutory factors in turn:

### (1)  Purpose and Character of Use

The first factor is the "heart of the fair use inquiry" and requires consideration of how the copied work was used. *Cariou v. Prince*, 714 F.3d 694, 705 (2nd Cir. 2013) (citing *Blanch v. Koons*, 467 F.3d 244, 251 (2nd Cir. 2006)).  "Central to determining the purpose and character of a work is whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a different character." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012).  As the Supreme Court has noted, a work is "transformative" if it "alters the original work with new expression, meaning, or message." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. "A use is considered transformative only where a defendant changes a

plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation." *Wall Data Inc. v. Los Angeles Cty. Sheriff's Dept.*, 447 F.3d 769, 778 (9th Cir. 2006). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

Here, Ferguson's photos are highly transformative of Neri's work. Neri's sculpture is art for art's sake. It is a three-dimensional, impressionistic composition of multiple colored pieces of translucent glass designed intentionally to cast spiral-shaped shadows on the vaulted ceiling, providing an aquatic quality to the entire space. Its purpose, presumably, is to beautify the Hughes condominium and to provide visual and aesthetic pleasure to those who view it as they walk under it through the entryway.

Ferguson's photographs, on the other hand, are two-dimensional, realistic photographs of an interior space. They have a commercial asthetic. Their purpose is not to beautify but to document (albeit to document the pleasing aesthetics and transformative power of the project as a whole) and to inform the public about the remodeling work performed by ABA on Hughes's condominium, in order to showcase the firm's design and construction work. Ferguson did not set out to photograph the sculpture itself or even to create an "artistic" photograph that capitalizes on the sculpture, but rather to show as accurately and realistically as possible what the condominium's entryway–the *entire* entryway–looked like after it was redesigned and rebuilt. Ferguson's intended and actual photographic subject was the room, not the ceiling sculpture.

By capturing partial images of the sculpture in conjunction with commercial photography of the room, Ferguson did not merely "supersede[ ] the objects of the original creation[s]," but

instead used the works for "a further purpose," giving them a new "meaning, or message." *Campbell*, 510 U.S. at 579.  Even accepting that Ferguson's images and defendants' use of them were for commercial purposes, the medium, composition, scale, character, expression and intended use of Ferguson's photographs are completely different from those of the sculpture itself.  Given the highly transformative nature of the photographs, this factor weighs heavily in favor of defendants.  *Cariou*, 714 F.3d at 706-07 (paintings incorporating copyrighted photographs of Rastafarians and the Jamaican landscape were transformative because paintings had different character, manifested entirely different aesthetic and gave photographs new expression: plaintiff's photographs were serene and deliberately composed, while defendant's art works were crude, jarring, hectic and provocative); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (Google's use of thumbnail images of plaintiff's copyrighted photographs was transformative because it provided an entirely new use for the original work; although photographs may have been created originally to serve entertainment, aesthetic or informative function, search engine "transforms the image into a pointer directing a user to a source of information," making it an electronic reference tool); *Campbell*, 510 U.S. at 594–96 (holding that 2 Live Crew's parody of "Oh, Pretty Woman" using the words "hairy woman" or "bald headed woman" was a transformative work, and thus constituted a fair use); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 796–98, 800–06 (9th Cir. 2003) (concluding that photos parodying Barbie by depicting "nude Barbie dolls juxtaposed with vintage kitchen appliances" was a fair use).

(2)  **Nature of The Copyrighted Work**

In general, "the more creative the work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][2][a], p. 13-186 (Matthew Bender, 2013 Ed.). Defendants acknowledge that Mendota Reflection is creative in nature. They argue, however, that in evaluating this factor, the court should take into account the fact that the sculpture is mounted onto *another* work, namely, the new barrel-vaulted ceiling, and that it was impossible to take pictures of the completed ceiling without also capturing images of the artwork mounted thereon. Although defendants raise a valid point, I find it more proper to consider this point under the third fair use factor. The second factor favors plaintiffs.

### (3)  Amount and Substantiality of Work Used

The third factor requires a court to examine the amount and substantiality of what was used in relation to the copyrighted work as a whole. *Harper & Row*, 471 U.S. at 564. It is both a qualitative and quantitative analysis. *Campbell*, 510 U.S. at 586; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2nd Cir. 2006). There is no per se rule against copying a work as a whole if it is necessary to the purpose and character of the use. *Chicago Bd. of Educ.*, 354 F.3d at 629. The focus is not on how much of the work was taken but to what extent the protected elements were copied from the original. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2nd Cir. 1987). "[T]he fair use copier must copy no more than is reasonably necessary . . . to enable him to purse an aim that the law recognizes as proper[.]" *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).

15

Here, defendants' aim, carried out through Ferguson, was to publish photographs of their own remodeling and architectural work, an aim that was surely proper. Neither of Ferguson's pictures depicts all 60 glass pieces of the sculpture directly or entirely. Instead, each photograph captures only some of the pieces, along with other equally important features of the redone hallway, including the waterfall, furniture and decorative accessories. Ferguson had no choice but to capture those images in order to photograph ABA's work: the glass pieces were mounted directly to the barrel-vault ceiling that ABA had engineered and constructed and that Ferguson was hired to photograph. As the court of appeals observed, any "copying" of Neri's work was incidental: "It was not possible to show what (ABA) had accomplished without displaying the sculpture along with the furniture and other aspects of the foyer." *Neri*, 726 F.3d at 993.

Plaintiffs argue that ABA should have had Ferguson take photographs of the hallway and ceiling before the glass pieces were installed. Ferguson could have done this, but this does not mean that plaintiffs prevail on point three. Plaintiffs' argument ignores the fact that ABA redesigned and rebuilt the ceiling and the lighting specifically to accommodate and illuminate the sculpture.[9] Therefore, ABA was entitled to take photos of the ceiling depicting how the ceiling served the purpose for which ABA had designed and built it. Further, the photographs were meant to showcase–and did showcase–the *entire* entryway: not just the barrel-vault ceiling, but also the custom built waterfall and other decorative elements that had transformed the room. Also, ABA wanted the photographs to use in its portfolio, to show potential clients and to apply

---

[9] Defendants also make a persuasive argument that the ceiling design was so integral to the artwork that ABA is a joint author of the work, but it is unnecessary to reach that question because the fair use issue is dispositive.

16

for industry awards.  Clearly, a photograph depicting the entire "finished product," including the permanent installation of the art glass, was a commercially reasonable use.

Finally, as noted above, any "copying" of the sculpture by Ferguson would have occurred only in the most ephemeral sense: no one interested in viewing or purchasing a glass sculpture like "Mendota Reflection" would be satisfied by mounting a copy of one of Ferguson's photographs to his or her ceiling.  Even Neri acknowledges that Ferguson's photos do not accurately depict the color of the glass or the shadows cast as a result of the specially-designed lighting installed in the ceiling, asserting that "the colors [of the glass] are de-saturated and the contrast levels are altered" to so great a degree in the photographs that it "affected the trade dress of Ms. Neri's color scheme."  Response to Sager's PPFOF, dkt. 118, no. 13.  Given Neri's own admission that the photographs are qualitatively different from the sculpture itself and the fact that the glass pieces shown are incidental to the true subject of the photograph (the entryway) I find that this factor weighs in defendants' favor.


### (4)  Effect of Defendants' Use on the Market

The Supreme Court has stated that this factor is "the single most important element of fair use." *Harper & Row*, 471 U.S. at 566.  "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67, quoting 1 Nimmer, § 1.10[D] at 1-87; *see also Stewart v. Abend*, 495 U.S. 207, 238 (1990).  The question is whether the new work will be a market substitute for the copyrighted material. *Campbell*, 510 U.S. at 591.  A court must consider "not only the extent of the market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and

widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market'" for the original.  *Id.* at 590 (quoting 3 Nimmer § 13.05[A][4], at 13–102.61).  "The less adverse impact on the owner, the less public benefit need be shown to sustain non-commercial fair use."  *Rogers v. Koons*, 960 F.2d 301, 311-12 (2nd Cir. 1992).

In *Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512, 518 (7th Cir. 2002), the court explained the essence of this factor by illustrating the distinction between transformative and superseding copies (or to use the dichotomy preferred by the court, "complementary" versus "substitutional" copying).  If the new work substitutes for and is likely to reduce the demand for the copyrighted original, then it is not a fair use.  *Id.* (explaining that a book review or parody compliments and does not reduce demand for original work, whereas burlesque is merely a humorous substitute catering to humor-loving segment of the original's market).

In this case, there is no evidence that the two photographs had any detrimental effect on the market for Mendota Reflection or on any other original works by Neri.  As defendants point out, there is no market for the sculpture itself because it is installed in a private residence: it cannot be publicly displayed.  Further, as already noted, it is difficult to imagine that a person interested in buying a work similar to the sculpture would deem a commercial photograph depicting only portions of the work to be an adequate substitute.  Indeed, even plaintiffs do not suggest that a viewer would have deemed a photograph of the Hughes vestibule to be a substitute for the sculpture itself.  *Accord Nunez v. Caribbean Intern. News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000) (finding that poor reproduction of plaintiff's modeling photo on newspaper's front page

would not reduce demand for other photos in modeling portfolio, and in fact, might increase it, noting that "a newspaper front page is simply an inadequate substitute for an 8" x 10" glossy.")

As for the possibility that Neri might attempt to sell her own photographs of the work or offer derivative works, Neri has offered no evidence that she has done so.  Indeed, until February 28, 2011, when she came across ABA's website, she had not done anything to even associate herself with Mendota Reflection, much less to attempt to profit from it beyond the initial fee for the piece that she split with Schomburg.  There is no evidence that any market for "Mendota Reflection" or derivative works exists; *a fortiori,* defendants' activities could not have affected a non-existent market.  This factor weighs in defendant's favor.

### (5) Conclusion

In sum, I find that the balance of the four fair use factors weights strongly in defendants' favor.  Although the sculpture is undeniably creative in nature, Ferguson's incidental photos of portions of it (and the other defendants' use of them) were for an entirely different, legitimate purpose, bore a completely different aesthetic and had no effect on the market for the work.

Since this is true of Ferguson's photographs, then it follows that Sager's candid photograph of her students viewing the Hughes' ceiling during a field trip also must be a fair use.  Like Ferguson's photograph, Sager's photograph captures some of the glass pieces, it had no effect on the market for the sculpture, and it was posted on the UW Design Studies website for educational purposes.

On a common-sense level, it is difficult to find that the use is "unfair," where plaintiffs have not been deprived of any value in the sculpture and in fact, could only have benefitted by

the publication of the photographs.  Clearly, this is a case where the goals of copyright law are better served by permitting the use rather than denying it.  Accordingly, defendants are entitled to summary judgment on plaintiffs' claim that they infringed their copyright in the Mendota Reflection sculpture, whether covered by copyright registration number VAu 1-066-185 or registration number VAu 001092700.

This court be the end of the court's analysis, but I will also address the issue of damages, since it also is a relatively clear basis for granting summary judgment to defendants:

## II. Damages

A plaintiff in a copyright infringement action must elect either statutory damages or actual damages.  17 U.S.C. § 504(c)(1); *Rhein Bldg. Co. v. Gehrt*, 21 F. Supp. 2d 896, 908 (E.D. Wis. 1998).  Even if the court were to assume, *arguendo*, that plaintiffs could establish infringement, the plaintiffs do not meet the criteria for statutory damages and they have no proof of actual damages.[10]

### A.  Statutory Damages

17 U.S.C. § 412 provides:

In any action under this title . . . no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for[11]—

---

[10] "The existence of damages suffered is not an essential element of a claim for copyright infringement." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 158 (2d Cir.2001) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  However, plaintiffs seek only monetary relief. Amended Complaint, dkt. 9, at 12.

[11] The full text of this paragraph sets out three exceptions, none of which apply here.

> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

This prohibition includes punitive damages. *Evans Newton Inc. v. Chicago Sys. Software*, 793 F.2d 889, 896 (7th Cir. 1986) ("17 U.S.C. § 412 prohibits the award of statutory damages (which would include punitive damages) or attorneys' fees unless the plaintiff registers its copyright prior to the infringement").

As defendants point out, there is no evidence in this case that the artwork at issue ever was "published." The Copyright Act defines "publication" as follows:

> the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

Here, the sculpture was installed–and remains installed–in a private residence. It is not on public display. Further, Neri did not "distribute copies" of the sculpture.

Plaintiffs argue that ABA's use of the photographs to apply for NARI awards constitutes "publication," but they are incorrect. For purposes of statutory damages and attorney fees under the Copyright Act, "publication" refers to the *copyright owner's* actions, not those of the alleged infringer. Stated another way, "an act that commences infringement does not publish an otherwise unpublished work." *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1026 (N.D. Cal. 2003). *See also* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 4.04 at

4-22 to 4-23 (2002) ("Congress could not have intended that the various legal consequences of publication under the current Act would be triggered by an unauthorized act of an infringer or other stranger to the copyright.").

Because the sculpture was never "published," under 17 U.S.C. § 412(1), statutory damages are not available for infringement that "commenced before the effective date of its registration."  It is undisputed that plaintiffs did not obtain a copyright on "The Artwork of Q" until May 4, 2011 and on "Processes of Mendota Reflection" until February 14, 2012.  It is also undisputed that defendants posted the photographs on their websites in 2009 or early 2010. Accordingly, because it is undisputed that defendants' alleged infringement commenced before the earliest effective date of Neri's registrations, statutory damages and attorney fees cannot be awarded under § 412(1).

This is true even though there may have been a brief period of infringement after Neri's copyright registration issued and before defendants removed the photographs from their respective websites.  Relying on principles of statutory interpretation and Congress's intent to promote the early registration of copyrights, courts have held that "infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998) (citing cases);  accord *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700-01 (9th Cir. 2008) (same); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 609 F.Supp. 1325, 1331 (E.D. Pa.1985) ("Interpreting 'commencement of infringement' as the time when the first act of infringement in a series of on-going discrete infringements occurs . . . would best promote the early registration of a copyright.").  Thus, "[a] plaintiff may not recover an award of statutory damages and attorney's

22

fees for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration." *Mason v. Montgomery Data, Inc.*, 967 F. 2d 135, 144 (5th Cir. 1992). Here, the alleged infringement began long before Neri attempted to register a copyright for the sculpture. Accordingly, plaintiffs are not entitled to an award of statutory damages even if they could prove infringement.

### B. Actual Damages

Under Section 504(b) of the Copyright Act, a plaintiff can recover "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Although actual damages and lost profits under 17 U.S.C. § 504(b) can be demonstrated in several ways, "all require that the copyright owner show either that it suffered a loss or that the infringer gained some benefit." *Northwest Airlines, Inc. v. American Airlines, Inc.*, 870 F. Supp. 1504, 1512-13 (D. Minn. 1994). *See also Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876 (9th Cir. 1992) (lost market value of work); *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357 (7th Cir. 1985) (value of use to infringer even if no profits resulted); *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983) (value of infringer's profits); Melville B. Nimmer & David Nimmer, Nimmer On Copyright § 14.02. Any benefit or loss shown must have been attributable to use of the copyrighted image. *Iconbazaar, L.L.C. v. Am. Online, Inc.*, 378 F. Supp. 2d 592, 594 (M.D.N.C. 2005). Although a plaintiff need not prove exactly the amount of damages from the infringement, the fact or existence of such damages must be shown with more than mere

speculation.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 513 (9th Cir. 1985).

Even when the evidence is viewed in plaintiffs' favor, they have not proved or demonstrated any loss on their part nor any gain on the part of defendants from the alleged infringement.  Plaintiffs admit they have no evidence that any defendant received any profit or other financial benefit attributable to use of photographs that contained the incidental images of Mendota Reflection, or that any defendant diverted from plaintiffs any customer who wanted to purchase Mendota Reflection or a photograph of it.  Plaintiffs have no evidence showing: that Neri was denied any referrals or monetary benefit associated with the sculpture; that any person has asked them to reproduce the sculpture; or that they have made any money from licenses or derivative works off the sculpture.

Plaintiffs' primary argument in support of actual damages is that they were deprived of the knowledge that ABA had won a NARI award for its work on Hughes's condominium. Plaintiffs contend that this deprived them of an opportunity to market the sculpture.  But as noted previously, the NARI award was not given for art and there is no evidence that the glasswork had anything to do with ABA's receipt of that award.  In any case, there is no evidence that plaintiffs were precluded or continue to be precluded from marketing "Mendota Reflections" as a result of the sculpture's incidental appearance in a photograph posted on a website.  Indeed, even if plaintiffs somehow could market the sculpture–which is not theirs to sell–or derivative works of some sort, there is no evidence that they have made any real attempt to do so.

Plaintiffs contend that they could have commanded a $5000 licensing fee for the rights to photograph the sculpture.  This is unsupported conjecture.  "The question is not what the

24

owner would have charged, but rather what is the fair market value." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2nd Cir. 2001).  Plaintiffs have never sold a license for anything related to this sculpture; Neri has never sold a license to utilize any rights to *any* of her artwork; and plaintiffs have adduced no evidence of any benchmark licenses, that is, what licensors have paid for use of similar work.  *Compare On Davis*, 246 F.3d at 166 (plaintiff testified he previously had received $50 royalty for use of photograph which included his sunglasses); *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 359 (S.D.N.Y.2003) (plaintiff produced evidence of previous license fees of $15 to $88 paid for publication of his photographs); *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 331–32 (S.D.N.Y. 2003) (noting that license fees paid to other artists could be used to measure the plaintiff's license fee).  The only evidence in the record regarding licenses indicates that there is *no* market for such a license.  Ferguson testified that he did not consider the incidental appearance of the glass pieces in the photographs to be of any value, and for that reason he would not have considered paying a licensing fee for the benefit of such use.  Similarly, Monroe testified that, based on her knowledge and experience in the design/build remodeling industry, she is not aware of a single instance of licensing of a piece of art in a residence.  On this record, plaintiffs' claim for licensing fees is wishful thinking.

In sum, damages "must be proved, and not just dreamed." *MindGames, Inc. v. W. Publ'g Co., Inc.*, 218 F.3d 652, 658 (7th Cir. 2000).  Plaintiffs have not provided any actual evidence that there are any actual damages or infringer's profits that they could recover under 17 U.S.C. § 504(b).

ORDER

25

It is ORDERED that:

(1)     The motions for summary judgment filed by defendants Architectural Building Arts, Inc., Melinda Monroe, Steven Larson, Leslie Sager and Eric Ferguson, dkts. **75**, **80**, **85**, are GRANTED.

(2)     Plaintiffs Quincy Neri and Rodney Rigsby's motion for summary judgment, dkt. **88**, is DENIED.

(3)     Intervenor defendant Rural Mutual Insurance Company's motion for summary judgment on its indemnification of defendant Eric Ferguson, dkt. **68**, is DENIED as moot.

(4)     Plaintiffs' motion for a hearing, dkt. **239**, is DENIED as moot.

(5)     The clerk of court is directed to enter judgment for defendants Architectural Building Arts, Monroe, Larson, Sager and Ferguson and to close the case.

Entered this 25th day of February, 2014.

                              BY THE COURT:

                              /s/

                              STEPHEN L. CROCKER
                              Magistrate Judge